**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5586-16T2

MITCHELL WILLIAMS,

      Plaintiff-Respondent/
Cross-Appellant,

v.

THE MLB NETWORK, INC.,

      Defendant-Appellant/
Cross-Respondent,

and

THE GAWKER MEDIA GROUP,
INC. and GAWKER MEDIA, LLC,

      Defendants.

_____

      Argued January 14, 2019 – Decided March 14, 2019

      Before Judges Sabatino, Haas and Mitterhoff.

      On appeal from Superior Court of New Jersey, Law Division, Camden County, Docket No. L-3675-14.

      Peter O. Hughes argued the cause for appellant/cross-respondent (Ogletree, Deakins, Nash, Smoak &

Stewart, PC, attorneys; Peter O. Hughes and Ryan T. Warden, on the briefs).

Rahul Munshi (Console Mattiacci Law, LLC) of the Pennsylvania bar, admitted pro hac vice, argued the cause for respondent/cross-appellant (Console Mattiacci Law, LLC and Rahul Munshi, attorneys; Laura C. Mattiacci, on the briefs).

PER CURIAM

Plaintiff Mitchell Williams is a former major league baseball pitcher. Several years after retiring from his professional career, Williams began working as a broadcaster and sports commentator for defendant, Major League Baseball Network ("the Network").

This appeal and cross-appeal center upon the Network's decision to terminate Williams based upon his employment contract's "morals clause." In pertinent part, the morals clause allowed the Network to fire Williams for engaging in "non-trivial" conduct that brings him "into disrepute, scandal, contempt or ridicule, or which shocks, insults or offends a substantial portion [of the] group of the community or reflects unfavorably (in a non-trivial manner) on any of the parties."

The Network invoked the morals clause after the emergence of news reports accusing Williams of using profane language and engaging in other inappropriate conduct while he was coaching his son's youth baseball team at a

2

weekend tournament in Maryland. Portions of two of those games were captured on videotape. In reaction to the reports, the Network sought to have Williams sign an agreement that would, among other things, censor his use of social media, and bar him temporarily from coaching or attending youth sporting events. Williams refused to accede to those restrictions, and the Network terminated him from the remaining portion of his contract.

Williams sued the Network for breach of contract and also pled other theories of liability. The Network brought a counterclaim against Williams, asserting that he breached his contract's confidentiality provision by publicizing the contract and attaching a copy of it to his complaint.

By a divided vote, a Camden County jury found the Network failed to prove Williams had actually engaged in the alleged conduct violating the morals clause. The jury accordingly awarded Williams compensation for the uncompleted term of his contract, but declined to award him damages for the Network's failure to exercise the contract's option year.

The Network now appeals the trial judge's failure to award it judgment as a matter of law, the judge's dismissal of its counterclaim, and various evidentiary rulings that allegedly skewed the jury's consideration. Meanwhile, Williams cross-appeals the judge's dismissal of the additional counts of his complaint

3

beyond his breach of contract claims.

For the reasons that follow, we reject the appeal and cross-appeal. Although there is no existing published opinion in this State involving a contractual "morals clause" to provide guidance, we are satisfied the trial judge and the jury resolved the parties' disputes in this case fairly and soundly, and did so based on ample relevant evidence and general legal principles. Neither side has demonstrated the alleged errors, if any, were clearly capable of producing an unjust result.

Table of Contents

I.  Facts ........................................................................................................ 6
    A.  The Parties ............................................................................................ 6
    B. The Parties' Contract .............................................................................. 7
    C.  The May 2014 Ripken Tournament Games .............................................. 8
    D.  The First Deadspin Article ...................................................................... 9
    E.  The Network's Review of the Incidents and Its Actions ........................ 10
    F.  Deadspin's Second Article ..................................................................... 11
    G.  The Network Places Williams On A Leave of Absence .......................... 13
    H.  The Proposed Contract Amendment ...................................................... 13
    I.  The Network Terminates Williams .......................................................... 15
    J.  Other Publicity ...................................................................................... 15
II. Procedural History ..................................................................................... 16
    A.  The Complaint and Counterclaim ........................................................... 16
    B.  The Trial Proofs ..................................................................................... 17
        1.  Williams's Trial Testimony Explaining His Conduct ......................... 17
        2.  Petitti's Trial Testimony ................................................................. 19

3. Other Witnesses Who Were At the Games ........................................ 19

4. The Network's Trial Witnesses ....................................................... 22

5. The Umpires' Testimony................................................................. 22

6. The Ripken Organization Witnesses .............................................. 25

C. Verdict and Post-Trial Motions......................................................... 27

1. The Jury Verdict........................................................................... 27

2. Post-Trial Motions........................................................................ 28

III. The Network's Appeal.................................................................... 29

A. Dismissal of the Counterclaim......................................................... 30

B. Denial of Judgment as a Matter of Law............................................ 33

C. Allegedly Incorrect Evidentiary Rulings .......................................... 40

1. Redactions of the Deadspin Articles ............................................ 42

2. Testimony Regarding the Source of the Deadspin Articles ............... 47

3. The Court's Decision to Mute Portions of the Saturday Game Video . 49

4. The Court's Exclusion of Media Reports of Williams's Past Behavior 52

5. The Court's Decision to Exclude Evidence of Williams's Prior Statements About Intentionally Hitting Batters ...................................... 56

6. Exclusion of Alcohol-Related Testimony......................................... 57

D. Comments By Plaintiff's Trial Counsel .............................................. 60

IV. Plaintiff's Cross-Appeal ................................................................. 65

A. CEPA Claim.................................................................................. 65

B. LAD Claim.................................................................................... 72

C. Defamation-Related Claims ............................................................ 76

D. Other Dismissed Claims ................................................................. 82

1. Implied Covenant ....................................................................... 82

2. Intentional Interference ............................................................... 83

3. Prima Facie Tort......................................................................... 85

V. Conclusion.................................................................................... 86

A-5586-16T2

## I. Facts

### A. The Parties

Williams is a former professional baseball player who retired in 1997. During his eleven-year career in the major leagues, Williams pitched for the Philadelphia Phillies and five other teams. He was voted to the National League All-Star team in 1989, and pitched for the Phillies in the 1993 World Series. Williams was known by the nickname "Wild Thing," the title of a 1966 song and the nickname of the protagonist pitcher in the 1989 film Major League.

Following his retirement as a player, Williams briefly pursued a coaching career in the minor leagues, and then worked as a marketing executive for a casino. In 2006, he began working in broadcasting as a baseball commentator, participating in radio shows and providing pre- and post-game commentary for the Philadelphia Phillies.

Williams also created a youth baseball team, the New Jersey Wild, apparently named after his baseball moniker. His son played on the Wild. The team played in tournaments in various states, but did not participate in a regular league. Williams coached the team.

The Network is the company responsible for operating the "MLBN" television channel, which was launched in 2009. It is a subsidiary of Major

League Baseball. From the inception of the Network and through all times relevant to this case, Anthony Petitti, a key trial witness, was the Network's chief executive officer.[1]

## B. The Parties' Contract

In 2009, the Network approached Williams for an audition, and thereafter hired him as an on-air analyst pursuant to an initial one-year contract. The Network extended the term by another year pursuant to an option in the initial agreement.

In November 2011, Williams entered into a five-year professional services contract with the Network to run from November 1, 2011, to November 1, 2016. The written agreement contained an optional one-year extension available to the Network at its discretion. Petitti signed the contract on behalf of the Network.

As we noted in our introduction, the contract contained a "morals clause," which allowed the Network to terminate the relationship if Williams engaged in certain conduct. The clause, Section 15.03, reads as follows:

> 15.03 Morals If Artist should, prior to or during the Term hereof commits any act, or omits from any action, which: (i) violates widely held social morals; (ii) brings Artist into (non-trivial) public disrepute, scandal, contempt or ridicule or which shocks, insults or offends

---

[1] By the time of trial, Petitti had left the Network and had been appointed chief operating officer of Major League Baseball.

A-5586-16T2

a substantial portion or group of the community or reflects unfavorably (in a non-trivial manner) on any of the parties; or (iii) materially reduces Artist's commercial value as a professional sports commentator, then Company may, in addition to and without prejudice to any other remedy of any kind or nature set forth herein, terminate this Agreement at any time after the occurrence of any such event upon written notice to Artist. Notwithstanding the foregoing, the parties hereto agree that no act or omission of Artist occurring prior to the Term, which is known to the general public at large as of the date hereof, shall entitle Company to terminate this Agreement pursuant to this Section 15.03.

The contract also contained a confidentiality provision, which obligated Williams to keep non-public information that he received from the Network "strictly confidential in perpetuity," apart from being allowed to show the information to personal legal or financial representatives. The Network retained the right to seek specific performance or terminate Williams's contract upon a breach of the confidentiality provision.

## C. The May 2014 Ripken Tournament Games

The key events that gave rise to this litigation occurred on May 10 and 11, 2014, when Williams and the Wild participated in a youth baseball tournament held by the Ripken Baseball organization in Aberdeen, Maryland ("Mother's Day tournament"). At the time, the Wild players were ten years old. The Wild participated in several games in the tournament, but only two games are relevant

to this case: the game against the Olney Pirates on Saturday, May 10, 2014 ("the Saturday game"), and the championship game against the South Jersey Titans on Sunday, May 11, 2014 ("the Sunday game").

### D. The First Deadspin Article

On Sunday, May 11, 2014, the sports website "Deadspin" published an article entitled "Mitch Williams Ejected From Child's Baseball Game For Arguing, Cursing." The article opened by claiming that Williams was ejected from the Saturday game "after a profanity-laced tirade in which he called an umpire a 'motherfucker' in front of the children," citing unnamed sources. The article also stated that one umpire confronted Williams after he made a comment to parents in the stands about getting an umpire fired, which led to a face-to-face argument with that umpire. The article contained photographs depicting the confrontation. The article also contained quotations from Williams's Twitter account.

Williams learned of the Deadspin story on Sunday night after his son showed it to him. Petitti and Lorraine Fisher, then the Director of Media Relations at the Network, also learned about the article Sunday night. Fisher spoke with Williams that night and again the following day, and Williams denied any wrongdoing.

### E. The Network's Review of the Incidents and Its Actions

On Monday, May 12, Williams and Petitti discussed the initial Deadspin article. Williams denied using any profanity during the Saturday game. He explained that he was not arguing a call at the time of his ejection, but was speaking with a parent. According to Petitti, Williams did not mention at that time any incidents regarding the Sunday game.

On Wednesday, May 14, Petitti and Fisher watched a video recording[2] of the Saturday game after obtaining it from Bill Ripken. Ripken, who testified as a defense witness at the trial, is a former professional baseball player. Ripken is an on-air analyst for the Network, and a co-owner of the Ripken Baseball organization.

The video from the Saturday game shows two incidents between Williams and the two umpires. The first incident occurred when Williams disputed a call at home plate early in the game. Only some of the exchanged words come through on the audio track, but no curse words are discernable. For most of the game, the words of the coaches cannot be heard over the cheers and noises from the crowd.

---

[2] We have reviewed this video, as well as another video from the Sunday game, which were exhibits from the trial court proceedings.

A-5586-16T2

The most notable incident that is somewhat observable in the Saturday game video occurred in the final inning when, while coaching first base, Williams was ejected by the outfield umpire, Scott Bolewicki. Prior to that ejection, Williams had been conversing with individuals out of the camera's frame.

After the ejection, the video shows Williams confronting Umpire Bolewicki, and then yelling that the umpire had threatened him. Williams demanded to speak with a Ripken representative, and did not immediately leave the field. After about two and a half minutes, the umpires walked away from Williams towards home plate, and the Wild coaches, including Williams, congregated near first base. About three minutes later, Williams left the field and the game resumed. The vast majority of Williams's words are not discernable on the recording.

Upon watching the Saturday game video on Wednesday, Petitti and Fisher concluded that it did not comport with Williams's explanation that the umpire had initiated the altercation. Nevertheless, Williams went on the air as scheduled through Thursday night, May 15.

### F. Deadspin's Second Article

On Friday, May 16, 2014, Deadspin published a second article entitled

A-5586-16T2

"Witnesses: Mitch Williams Called Child 'A Pussy,' Ordered Beanball," regarding events that occurred during the Sunday game.[3] According to this second article, Williams ordered his pitcher to strike the opposing batter by issuing such instructions to his catcher, and insulted an opposing player by calling him a "pussy." Like the first article, the second Deadspin posting cited and contained quotes from unnamed sources. It also included two video clips from a recording of the Sunday game.

The videos from the Sunday game show Williams speaking with his catcher, and his catcher speaking to the Wild pitcher, before a pitch struck a Titans' batter in the body. However, the microphones did not pick up the substance of his instructions. Nor do the recordings contain any evidence that Williams had insulted an opposing player.

After Petitti learned of the second Deadspin article on Friday, he ordered Williams to not go on air. Petitti called Williams and told him to go to Fisher's office, where he watched the video clips of the Sunday game embedded in the second article. The following day, Petitti and Williams discussed the matter over the phone.

---

[3] A "beanball" is "a pitch intentionally thrown at the batter's head." Webster's II New College Dictionary 96 (3rd ed. 2001).

A-5586-16T2

In his conversations with Petitti, Williams denied ordering a beanball, and denied insulting a child using inappropriate language. Williams explained that he was "trying to knock the kid off the plate" by having his pitcher pitch inside rather than down the middle of home plate, and did not intend to have the ball hit the child. Petitti found the explanation inappropriate, even though pitching "inside" is not prohibited by the rules of baseball and he admitted that he was unaware of a tournament rule that would otherwise prohibit the practice. In Petitti's opinion, ten-year-old children do not possess sufficient ball control to safely pitch inside, and it was inappropriate to seek to intimidate such a young batter.

## G. The Network Places Williams On A Leave of Absence

On Saturday, May 17, after the phone call between Petitti and Williams, the Network issued a statement placing Williams on a leave of absence. According to Petitti, during the Saturday phone call, the parties mutually agreed upon a leave of absence. Williams denies that the decision was mutual. In any event, Williams never spoke with Petitti after May 17.

## H. The Proposed Contract Amendment

Over the next several days, Petitti engaged in discussions with Williams's agent, Russ Spielman, in an attempt to establish conditions for Williams's return

from suspension.

The Network proposed a contract amendment to Williams. The proposed amendment acknowledged that Williams was "involved in reported incidents of inappropriate behavior" at "certain youth athletic events." It stated that, in consideration for the Network's "covenant not to exercise its right to terminate the Agreement," Williams would not: (1) attend any amateur athletic events of any kind for one year; (2) coach, or otherwise participate in, any amateur athletic event for the remainder of the contract; (3) engage in social media posting without the Network's prior approval; (4) and would engage in therapeutic counseling. According to Petitti, the Network was willing to negotiate these conditions. Petitti called Spielman several times to obtain a response to the amendment proposal, but was unsuccessful.

After receiving the Network's proposal, Williams sought legal advice because Spielman is not an attorney. On June 25, 2014, counsel for Williams sent a letter on his behalf to the Network, asserting that Williams "has not engaged in any conduct that in any way violates his Agreement." The attorney also stated, "MLB Network's suspension constitutes a breach of the Agreement and has caused significant damage to Mr. Williams." The attorney continued, "[t]he purpose of this letter is to determine whether or not an amicable resolution

14

can be reached in connection with Mr. Williams's Agreement."

## I.  The Network Terminates Williams

The Network did not respond to the June 25, 2014 letter.  Petitti interpreted the attorney's letter as threatening, and believed that it changed the "tenor" of previous conciliatory discussions with Spielman.

The next day, on June 26, 2014, Petitti terminated Williams's contract with the Network, immediately halting his salary payments.  The stated basis for the termination was a violation of the contract's morals clause, and Williams's perceived rejection of the proposed contract amendment.

## J.  Other Publicity

Nothing in the record indicates that the Williams story gained any particular notoriety beyond the two Deadspin articles.  According to Fisher, some local news stations in the Philadelphia broadcast market reported the story.  One national television show contacted Fisher regarding Williams's conduct at the tournament, but never ran a story on the subject.  The final article dealing with the subject was issued on May 27, 2014, about a month before Williams's termination from the Network.

A-5586-16T2

## II. Procedural History

### A.  The Complaint and Counterclaim

In September 2014, Williams filed a complaint in the Law Division against the Network, The Gawker Media Group, Inc., and Gawker Media, LLC.[4] The complaint was venued in Camden County, where Williams resided at the time of the complaint.[5]  As to the Network, the complaint alleged breach of contract; breach of the implied covenant of good faith and fair dealing; negligent misrepresentation; negligence; violation of the New Jersey Law Against Discrimination ("LAD"), N.J.S.A. 10:5-1 to -42; three defamation counts; intentional interference with prospective economic advantage; invasion of privacy; violation of the Conscientious Employee Protection Act ("CEPA"), N.J.S.A. 34:19-1 to -14; and prima facie tort.  Williams annexed a copy of his employment contract, upon which his claims were based, to the complaint.

---

[4]  The Gawker Media Group and Gawker Media LLC were dismissed from the case prior to trial and are not involved in this appeal.

[5]  According to his trial testimony, Williams has since moved out of state.  There is no claim by either appellant that the jury was biased in favor of or against Williams because of his popularity or notoriety in the greater Philadelphia and South Jersey area, where he formerly played and resided.  Nor is there any assertion of bias as to potential jurors who may have been satisfied or dissatisfied subscribers of the Network.  We presume the voir dire process, which the parties chose not to have transcribed, removed any openly biased jurors to the satisfaction of counsel.

A-5586-16T2

The Network moved to dismiss the complaint or, in the alternative, for summary judgment. On February 5, 2015, the trial court granted the Network partial summary judgment, dismissing all counts as to the Network with prejudice, apart from Williams's breach of contract claim. The Network then filed a counterclaim, which alleged that Williams violated the parties' confidentiality agreement by annexing his employment contract to the complaint.

During a pretrial hearing on June 6, 2017, the court dismissed the Network's breach of contract counterclaim. The ensuing jury trial took place over several days in June 2017.

## B. The Trial Proofs

### 1. Williams's Trial Testimony Explaining His Conduct

Williams testified at trial and provided his version of the Mother's Day tournament incidents.

Regarding the Saturday game, Williams denied using "any foul language or curse words at this ball game whatsoever." He testified that, immediately prior to his ejection, one of his team's parents told him "Mitch, you know there's nothing you can do about it," after the umpire called a strike on his batter. Williams claims that he responded to the parent, "I know there's nothing I can

17

do about it," and, while laughing, stated "[t]he only thing I can do about it is maybe call the Ripken folks and see if we can't find these guys other employment." Umpire Bolewicki ejected him after that statement.

Williams explained that he confronted Bolewicki because he did not understand why he was ejected. Bolewicki stated, "no one is getting to threaten my job," but in Williams's view that was not a valid basis for ejection. In his view, Bolewicki was being aggressive towards him. Williams claims he told Bolewicki, "[g]et out of my face," and, "[d]o you honestly think I'm scared you're going to beat me up?" He testified that Bolewicki responded "[n]ame a time and a place." After that comment, Williams demanded to speak to a Ripken tournament representative and did not immediately leave the field. After leaving the field, Williams watched the remainder of the game near the field accompanied by a tournament director.

Williams resumed coaching on Sunday. Williams testified that during the Sunday game, an umpire informed him that the opposing coach accused him of calling an opposing player "the 'P' word." Williams denied it, and the umpires said they did not hear anything of that sort.

According to Williams, later in the game, he instructed his son – his team's catcher – to tell the pitcher to "try and keep the ball inside on this kid" to either

force a foul ball or "jam" the batter. After the Wild pitcher struck a Titans' batter with a pitch, the opposing coach reacted angrily. The umpire allegedly said, "[k]ids get hit every now and then," and nothing came of it. Williams denied ordering his pitch to hit the batter and denied insulting the opposing player.

## 2. Petitti's Trial Testimony

Williams called Petitti as an adverse witness. In his testimony, Petitti described his understanding of the alleged incidents from the tournament, including ordering a beanball, insulting a child, and engaging in a profanity-laced tirade against an umpire, as justifications for the termination. According to Petitti, the "combination of those events," and the reaction by the public, embarrassed the Network and provided adequate grounds for the Network's invocation of the morals clause.

## 3. Other Witnesses Who Were At the Games

Williams presented the testimony of several other persons who were present at the Saturday and Sunday games.

Corey Ahart, an assistant coach of the Wild who was present at the tournament, testified as a fact witness. Regarding the Saturday game, Ahart largely corroborated Williams's account, noting that he did not recall "any profanity whatsoever." Ahart was present for the exchange between Williams

and Bolewicki, and interpreted the events as Bolewicki threatening Williams. Regarding the Sunday game, Ahart testified that he was unaware of any instruction for the pitcher to hit a batter, and he did not hear Williams insult a child. He stated he had never seen Williams directly or indirectly order a beanball, and testified that "it wouldn't be allowed."

Craig Yates, another assistant coach of the Wild, also testified on behalf of Williams, and provided similar testimony to Ahart.

L.R.,[6] a spectator whose son played for the Wild, also testified on behalf of Williams. She was present at the championship game on Sunday. She testified that she was seated about ten feet away from Williams for most of that game, and that she never heard him order a beanball or insult a child. However, L.R. acknowledged that when Williams coached first base when the Wild were batting, she had sat far away from him.

R.W., another parent whose child played for the Wild, testified as to her observations at the Saturday and Sunday games. She testified that, before the Saturday game started, she heard one of the umpires say to a tournament representative, "I'm not going to put up with Coach Mitch Williams." During

---

[6] We use initials for the children, parents, and spectators to protect the privacy of the minors.

A-5586-16T2

the game, she sat close to first base, where the ejection and confrontation occurred. Her account of the lead-up to the ejection differed slightly from that of Williams. She testified that the umpire ejected him after overhearing a joke he made to his assistant coaches, rather than the parents. According to R.W., Williams asked his assistants, "hey, what would happen to me if I was calling balls strikes, I would get fired," which prompted the ejection.

R.W. also testified that she never heard Williams use any profanity, apart from using the word "ass" in a non-insulting manner on one occasion. She testified that the umpire, not Williams, repeatedly used profanity during his confrontation with Williams. At the Sunday game, she heard nothing regarding a beanball, and did not hear Williams insult the opposing player.

The final witness presented by Williams was A.M., another spectator of the Sunday game, whose video deposition was entered into evidence with redactions. A.M.'s son played for the Titans at the time, but had previously played for the Wild. A.M. sat behind home plate during the game. He testified that he did not hear Williams insult a child using a vulgar word, and did not hear Williams tell the catcher to order a beanball. He also discussed his observations from other youth baseball games, noting that pitching inside "is a key point of winning" and "[a]ll our pitchers pitch inside and do it well, as well as outside."

21

At the conclusion of Williams's case in chief, the Network moved for involuntary dismissal as a matter of law. The trial court denied the motion.

### 4. The Network's Trial Witnesses

The first witness for the Network was K.N., who played for the Titans during the championship game on Sunday. K.N. testified that, at the end of an inning, after the Titans' pitcher struck out Williams's son, Williams turned his head to the pitcher and said, "you're too pussy" to "throw my son a fastball." K.N. informed the pitcher's father, who coached the Titans, about this remark.

### 5. The Umpires' Testimony

The Network next presented the video deposition testimony of Joseph Addis and Scott Bolewicki, the umpires from the Saturday game. Addis testified that before the game started, he overheard Williams use the word "fucker" and warned him not to use profane language on the field. Addis was the home plate umpire during the game. He stated that Williams frequently complained about calls during the game. He described one incident at home plate in which Williams vociferously disputed a call for "five to ten minutes," although the video only showed the dispute lasting for less than a minute and a half. Addis also recounted the altercation between Bolewicki and Williams and the aftermath of the ejection.

22

According to Addis, Williams was ejected after physically pushing Bolewicki, but the video does not depict any pushing and the ejection occurred prior to the altercation. Addis heard parts of the discussion between Williams and Bolewicki, but heard no profanities during the altercation. He denied hearing Williams engage in a "profanity-laced tirade," as alleged in the Deadspin article, because he was not close enough. Addis never heard Williams use any profanity on the field, although he did hear Williams mutter "bastards" when walking back to the dugout.

Umpire Bolewicki testified that he also heard Williams use the term "fucker" before the game, but denied giving him any warning. Bolewicki was the outfield umpire during the Saturday game. He testified that during the home plate incident with Addis, Williams used a "lot of profanities" during his objections to the call, including "a lot of MF's and a lot of F's," even though Addis had testified he heard no profanities during the game. Bolewicki claimed the cursing was loud enough for spectators to hear, even though no profanities appear on the video's audio during the exchange.[7] Bolewicki claimed that he

---

[7] The video camera and microphone were located behind home plate, and thus picked up much more of the conversation between Addis and Williams following the home plate incident than the subsequent ejection and confrontation between Bolewicki and Williams that occurred further away by first base.

heard Williams use profanity "just about every inning in the game," contrary to Addis's testimony.

However, Bolewicki also testified that, "it's in the rules at Ripken, you drop an F bomb, you're gone." He explained that, "the minute everybody can hear it, and it's in the earshot of the kids and everything and the other team, the other managers, the other parents, [the umpires] have to step up and do something." Bolewicki did not explain why, despite these principles, he did not address until the ejection what he claims was Williams's constant and loud use of profanity throughout the game.

As to the ejection, Bolewicki recalled that he heard Williams proclaim the following, in essence, to the spectators:

> [T]hese fucking guys don't know who I am and who I fucking know. They make fourteen to fifteen dollars a fucking hour . . . That's what you get from Ripken when you give these guys some money, and this is what you expect from Ripken . . . [Y]ou guys will both be out of jobs tomorrow.

Bolewicki testified that after hearing this alleged remark, he ejected Williams from the game. He recalled Williams repeatedly screamed "Why?," and "chased" him, and would not leave the field. Bolewicki also contended Williams called him an "asshole" and "motherfucker."

According to Bolewicki, Williams yelled at him between fifteen to twenty

24

minutes, and then threatened him "in a low tone where nobody else would hear it." Bolewicki admitted to responding, "time and place." As shown by the video, the game resumed about five and a half minutes after the ejection.

### 6. The Ripken Organization Witnesses

The Network further presented the video deposition of Brett Curll, the assistant director of amateur baseball for the Ripken Baseball organization. Curll was one of the directors at the Mother's Day tournament. After another tournament official called Curll regarding a complaining coach, Curll responded to the field and began watching the Saturday game. He observed one inning, then left to make a phone call. He ended the call early after hearing a commotion on the field.

When Curll arrived to the field, Williams already had been ejected and was refusing to leave. Williams was yelling, claiming the umpire threatened to fight him. Curll did not hear, and no one reported, Williams calling the umpire a "motherfucker" or "asshole." Williams repeatedly claimed the umpire threatened to fight him, and Curll eventually escorted him off the field after advising that his team would forfeit if he did not leave. He remained with Williams until the game was over.

After the game, Curll attempted to speak with Bolewicki to "get his side

of the story." However, Bolewicki stormed off stating, "You're taking his side. That's fucking bullshit," and left before Curll could question him further. At a later date, Curll eventually did speak with Bolewicki, who explained that Williams had uttered a profane word prior to the game and repeatedly challenged calls during the game. Bolewicki did not report any frequent use of profanity to Curll.

Curll explained that Williams was allowed to return to coaching the following day because, at the time, tournament officials were unable to dismiss Williams's argument that Bolewicki threatened him, due to Bolewicki storming off and failing to provide his side of the story. He also testified regarding the games on Sunday, which he and other tournament officials closely monitored. Curll explained that, after the alleged beanball incident, neither umpire believed anything malicious had occurred. According to Curll, some pitchers at that age have "pretty good control of where they want the ball to go," but batters get hit "often."

Bill Ripken also testified on behalf of the Network. Ripken did not attend the Mother's Day tournament. He testified instead about his role in the Network's response to the allegations, including forwarding the first Deadspin article to Fisher after the Sunday game, and watching the video of the first game

with Williams the following Wednesday.

Ripken initially did not think the Saturday game incidents were significant, but he changed his mind after watching the video. After the second Deadspin article came out discussing the alleged beanball incident, he regarded that as the bigger issue.

Following the presentation of evidence, the parties each moved for judgment as a matter of law. The court denied the motions, and sent the case to the jury after closing arguments and the jury charge.

## C. Verdict and Post-Trial Motions

### 1. The Jury Verdict

The court submitted the following questions to the jury:

> 1. Did Defendant The MLB Network, Inc., prove by a preponderance of the evidence that Plaintiff Mitchell Williams violated the morals clause of his November 2011 Contract?
>
> . . . .
>
> If you answered "NO," please proceed to Question 2. If you answered "YES," your deliberations are over, you have reached a verdict for Defendant The MLB Network, Inc.
>
> 2. Did Plaintiff Mitchell Williams prove by a preponderance of the evidence that had he not been terminated, it was reasonably likely he would have been offered the option year of November 2016 to November

2017?

By a vote of six to two,[8] the jury responded "NO" to both questions, which resulted in a verdict for Williams. The jury awarded Williams $1,565,333.34 in stipulated compensatory damages. The court also awarded Williams $9,700 in prejudgment interest and $2,990 in costs.

## 2. Post-Trial Motions

After the verdict, the Network moved for a new trial, based on alleged evidentiary errors, and for judgment notwithstanding the verdict. Regarding the motion for a new trial, the court relied upon its prior evidentiary rulings and denied the motion. As to the Network's motion for judgment notwithstanding the verdict, the court identified disputed issues of fact, such as whether Williams used profanity against an umpire. The court also noted that the jury had to consider not only Williams's disputed conduct but also his undisputed actions, because it had to make a determination as to whether the conduct rises to the level of a morals clause violation.

The Network also moved for judgment notwithstanding the verdict based on the contract's confidentiality provision. The Network argued that Williams

---

[8] Counsel evidently consented to let the two alternate jurors deliberate. See R. 1:8-2(b)(3).

had breached the confidentiality provision when he appended the contract to his complaint, ending any obligations the Network had towards Williams. The court disagreed, finding that Williams did not act in bad faith and that he substantially complied with the contract's notice and objection provisions.[9]

This appeal and cross-appeal followed.

### III. The Network's Appeal

On appeal, the Network raises several points advocating reversal. It argues: (1) the trial court erred in failing to grant the Network judgment dismissing all of Williams's claims as a matter of law during or after trial; (2) the court erred by dismissing the Network's counterclaim alleging breach of confidentiality; (3) the court unjustifiably denied the Network's motion for a new trial based upon unsound evidentiary rulings that skewed the jury's fair assessment of the case; (4) the court should have granted the Network a new trial based upon allegedly improper comments by plaintiff's counsel; and (5) the court should have granted summary judgment dismissing all of the plaintiff's claims, including the breach of contract claim that went to trial.

---

[9] In a prior unpublished appeal, this court rejected the Network's argument that the trial court abused its discretion in declining to seal portions of the record in this case. Williams v. The MLB Network, Inc., No. A-1674-14 (App. Div. Sept. 10, 2015) (slip op. at 7-8).

We have carefully considered each of these arguments in light of the record and the applicable law. Having done so, we reject the Network's demands for relief. On the whole, the Network has failed to demonstrate that any of the errors it claims are "of such a nature as to have been clearly capable of producing an unjust result." R. 2:10-2. We proceed to discuss these arguments, although in a somewhat different sequence.

## A. Dismissal of the Counterclaim

We first address the Network's contention that the trial court improperly dismissed its counterclaim alleging that Williams breached the confidentiality provision in his employment contract by attaching the contract to his complaint. We discern no such actionable breach in the circumstances presented.

As we understand it, the Network required Williams (and apparently other "talent" it employs) to sign a confidentiality agreement to prevent the terms of compensation, contract length, renewal or extension options and other details from being divulged to other employees or prospective hires. According to the Network, if those contract terms were made known to other on-air analysts or their agents, that information might put the Network at a disadvantage in contract negotiations.

We need not decide here whether or not the objective of secrecy is legally

30

enforceable and consistent with public policy.  Even presuming, for the sake of discussion, the confidentiality provision is generally enforceable, the particular context of this contract litigation in a public forum bears heavily upon the analysis.

As the trial court quite correctly recognized, the November 2011 contract inevitably would have been made part of the public record even if Williams had not attached the document to his complaint.  See R. 1:2-1 (generally directing that "[a]ll trials, hearings of motions and other applications . . . and appeals shall be conducted in open court unless otherwise provided by rule or statute.").  This court made clear in its September 10, 2015 unpublished opinion that the trial court did not abuse its discretion in denying the Network's motion to seal the record.  Williams, No. A-1674-14 (App. Div. Sept. 10, 2015) (slip op. at 7-8).  We found – and continue to find – that the Network failed to demonstrate a serious injury that would result upon publication of Williams's contract, and that any harm resulting from its dissemination would be "impermissibly speculative."  Id. at 8.  If the Network wanted to have an eventual dispute with Williams resolved in a private arena, it could have attempted to negotiate an arbitration or some other alternative dispute resolution provision in the contract. It failed to do so.

31

Any suggestion by the Network that it suffered damages because the contract's contents were disclosed sooner, rather than later, is not supported or persuasive.[10] We reject the Network's argument that Williams's disclosure of his contract by attaching it to his complaint operated to cut off his prospective damages.

Nor are we persuaded that Williams separately violated the confidentiality clause by issuing a press release after filing the complaint. As we have already noted, the details of the contract – including plaintiff's terms of compensation – surely would have been divulged out of necessity during the course of the litigation, through motion practice and the proofs at an ultimate trial. The trial court had no compulsion to deviate from the New Jersey tradition of "open court

---

[10] Our reasoning in this regard is consistent with that of courts in other jurisdictions. See, e.g., Tax Matrix Techs., LLC v. Wegmans Food Mkts., Inc., 154 F. Supp. 3d 157, 188 (E.D. Pa. 2016) (dismissing breach of confidentiality counterclaim in part because no evidence of damages, in case where defendant alleged breach in part due to filing of lawsuit); Tsintolas Realty Co. v. Mendez, 984 A.2d 181, 187 (D.C. Cir. 2009) (dismissing property management company's argument that tenants' breach of confidentiality when filing motion nullified its obligations, because "the discernable consequences to the company of the tenants having attached a copy of the agreement to the motion were nil"); Kronenberg v. Katz, 872 A.2d 568, 606, 609 (Del. Ch. 2004) (holding, in case where plaintiff breached confidentiality agreement by annexing contract to complaint, that breach could not give rise to compensable damages because "[o]nce this court applied the appropriate standards, the complaint would have been promptly unsealed – which is what happened.").

proceedings" reflected in Rule 1:2-1 and seal the documents in the record containing the actual contract that is at the very heart of this case.  Our prior opinion rejected the Network's claim for sealing under Rule 1:38-11.  Moreover, a jury trial in this civil action would not have been conducted behind closed doors.

In sum, the dismissal of the counterclaim was entirely appropriate and consistent with our laws and Rules of Court.

### B.  Denial of Judgment as a Matter of Law

We next consider the Network's related contentions that the trial court should have granted it summary judgment, as a matter of law, dismissing all of Williams's claims before trial, or at least the court should have dismissed them during or after the trial.  We disagree.

The breach of contract claim brought by Williams against the Network was clearly viable.  The crux of the parties' contractual dispute was whether or not Williams, by his reported behavior at the Ripken baseball tournament on May 10 and 11, 2014, violated the morals clause set forth in Section 15.03 of his employment contract.  We agree with the trial judge that this issue involved hotly disputed genuine issues of material fact.  As such, the judge was justified in denying summary judgment under the standards of Rule 4:46-2 and having

those factual disputes resolved by a jury. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995). Moreover, the judge also acted appropriately within his authority in denying the Network's motions at the close of plaintiff's case to dismiss the contractual claim, as well as its post-verdict motion to set aside the jury's adverse determination. See Verdicchio v. Ricca, 179 N.J. 1, 30 (2004) (regarding the similar standards for directed verdict and a new trial according the non-moving party the benefit of all legitimate inferences from the evidence).

There are no reported cases in our State involving an alleged breach of a morals clause within an employment contract. Nevertheless, general principles of contract law can inform the analysis. "To prevail on a breach of contract claim, a party must prove a valid contract between the parties, the opposing party's failure to perform a defined obligation under the contract, and the breach caused the claimant to sustain[] damages." EnviroFinance Grp., LLC v. Envtl. Barrier Co., LLC, 440 N.J. Super. 325, 345 (App. Div. 2015).

In this instance, the existence of the parties' written contract is undisputed. The issues instead concern whether Williams breached the contract through his actions at the Ripken tournament. If those actions rose to the level covered by the morals clause, then Williams was in breach of the contract and the Network was justified in terminating him. Conversely, if Williams did not violate the

morals clause, then the Network had no contractual right to terminate him and therefore would be liable for his damages caused by that wrongful termination.

To interpret the meaning of the morals clause, the court must consider the language of the agreement and the parties' mutual intent and understanding. See Manahawkin Convalescent v. O'Neill, 217 N.J. 99, 118 (2014) (explaining that courts interpret contracts pursuant to the intent of the parties, and consider the plain language of the agreement and all other evidence to discern intent).

From the plain language of the agreement, to trigger the morals clause the alleged conduct must either: (1) bring the employee into non-trivial public disrepute, scandal, contempt or ridicule; (2) shock, insult, or offend a substantial portion of the public; or (3) reflect unfavorably on the contracting parties in a non-trivial manner. (Emphasis added). Petitti acknowledged his understanding that this language required the conduct to be significant. The contract does not define or provide examples of non-triviality, nor does it define what it means by offending a "substantial portion" of the public.

It is evident from this contractual language that, to trigger the morals clause, the employee must actually engage in the acts that form the basis of employer action. In other words, under the terms of the agreement, it is not enough for a media company to publish a disparaging article about an employee.

35

To justify termination, the employee must have engaged in the conduct asserted in the article.

That plain reading is in accord with the parties' mutual understanding. Petitti, who signed the November 2011 contract on behalf of the Network, admitted that to trigger the morals clause, the underlying conduct alleged in a publication must have actually occurred. The trial judge noted in this regard that both sides agreed that proving the underlying inappropriate conduct was the ultimate issue in the case.

On appeal, the Network predicates its argument for judgment as a matter of law entirely upon the initial article and the events of the Saturday game. However, Williams presented sufficient evidence for a reasonable juror to conclude that he did not actually engage in the conduct described in the first article.

The initial Deadspin article alleged that Williams engaged in a "profanity-laced tirade" against an umpire, but Williams testified that he used no profanity during the Saturday game. The article also alleged that Williams called the umpire a "motherfucker," which he denied. Other witnesses from the Saturday game – the two assistant coaches and R.W. – testified that they did not hear Williams use any profanity against the umpire.

Tellingly, although Umpire Bolewicki testified that Williams used profanity "just about every inning in the game," Umpire Addis testified that he never heard Williams use profanity on the field. Thus, even among the Network's own witnesses, factual disputes persisted regarding Williams's actual conduct that day and the accuracy of the article's allegations.

The Network also argues that the video itself constitutes sufficient proof to corroborate the first Deadspin article, but no instance of profanity by Williams is discernable from the video's audio. Thus, the video does not prove the article's most serious allegations. The morals clause does not hold Williams to the words utilized by reporters citing anonymous sources. Instead, it holds him to his own actual conduct.[11]

Whether the conduct displayed in the video rises to the level of a morals clause violation was a proper matter for the jury to decide. Based on the

---

[11] We need not reach here whether a contractual morals (or "morality") clause could properly allow an artist, sports figure, or other employee to be terminated based on adverse publicity alone, even if the publicity is baseless. See Patricia Sánchez Abril & Nicholas Greene, Contracting Correctness: A Rubric for Analyzing Morality Clauses, 74 Wash. & Lee L. Rev. 3, 35-36 (2017) (proposing that "[i]n light of the increasing breadth and use of morality clauses across many ranks, the time is right to examine these restraints closely, taking into account their potential legal failings and adverse consequences on public policy grounds.").

A-5586-16T2

evidence presented at trial, reasonable minds could also disagree on whether the articles brought Williams into non-trivial public disrepute, offended a substantial portion of the public, or reflected unfavorably upon him in a non-trivial manner. Weighing triviality and measuring the level of shock or offensiveness to the public is uniquely suited to the jury's capabilities, particularly in light of the November 2011 contract's failure to define or illustrate the meaning of "non-trivial."

The Network further argues that the video shows Williams remonstrating with the umpires, but a reasonable juror could conclude, after viewing the video, that such remonstrations are commonplace at youth sporting events and fall under the category of trivial conduct. In addition, Fisher testified that the last article on the subject issued on May 27, 2014, just over two weeks after the tournament and weeks before Williams's termination. A reasonable juror could view the short-lived coverage as evidence of the allegations' arguable triviality.

A reasonable juror also could rely upon the Network's own initial conduct to find at least some of the allegations in the first Deadspin article were not significant enough to trigger the morals clause. Following Petitti's receipt of the first article, the Network took zero action against Williams. Williams continued to appear on-air through the next week. It was only after publication of the

second article, which contained more serious allegations that Petitti ordered Williams to refrain from going on-air. If the Network did not initially consider the first article's allegations sufficiently serious to justify suspending Williams, a reasonable juror could come to the same conclusion.

The only fact on which the parties apparently agree is that an umpire did eject Williams from the Saturday game. But the jurors could reasonably find that the ejection alone, without additional facts being established by the Network, was not enough to violate the contractual morals clause and justify his discharge.

In sum, the trial court did not err by denying the Network's motion for dismissal and motion for a directed verdict. The jurors appropriately decided the close factual issues in this case. By a non-unanimous vote permitted under Rule 1:8-2(c)(3), they concluded that Williams had established his breach of contract claim and that the Network had not proven his violation of the morals clause.

Notably, the jurors sided with the Network on Williams's separate contention that the Network would have exercised its extension option if he had not been wrongfully terminated. Williams has not cross-appealed that adverse determination. These verdicts reflect a thoughtful and careful assessment of the

39

case. We perceive no injustice in the jurors' decisions that the judge rightfully entrusted to them.

### C. Allegedly Incorrect Evidentiary Rulings

The Network raises several arguments contending the trial judge made several incorrect evidentiary rulings that had the cumulative effect of depriving it of a fair trial. We are unpersuaded by those arguments. Before we address them in detail, we present a few important preliminary comments that must frame the discussion.

It is well established that appellate review of a civil trial judge's evidentiary rulings is limited. We generally will not set aside a civil trial judge's decisions to admit or exclude evidence unless the appellant demonstrates the judge abused his or her discretion. See Hisenaj v. Kuehner, 194 N.J. 6, 16 (2008); see also In re Accutane Litigation, 234 N.J. 340, 391 (2018). The judge's various evidentiary rulings that displeased the Network must be viewed through this deferential prism.

Upon thoroughly canvassing the record, it is plain that the trial judge's evidentiary rulings were not skewed, on the whole, against the Network. In fact, the judge made a number of rulings on motions in limine and midtrial objections that went against plaintiff.

By way of non-exhaustive examples, we note the trial judge: denied plaintiff's motion in limine to limit the evidence to conduct actually known by Petitti before terminating plaintiff; denied plaintiff's motion in limine to preclude the defense from offering the "beanball" proof as cumulative evidence; granted the defense motion in limine to bar plaintiff from presenting comparative evidence concerning the Network's termination of its contract with another sports analyst; sustained defense counsel's objection to Williams testifying about team parents pulling their children from the Wild team after the incidents; sustained a defense objection to Williams recounting hearsay testimony about what a family friend had advised him concerning his contract; and overruled plaintiff's objections concerning certain emails and anger management therapy.

An objective review of the transcripts as a whole reflects that the trial judge, in whom we must afford considerable discretion, even-handedly kept the focus of the trial where it belonged. The judge commendably prevented both sides from straying into collateral matters, or from exposing the jurors to incompetent proofs or inadmissible hearsay. The Network's suggestion that the judge skewed the case against it is belied by the record. The suggestion is also undercut by the judge's important ruling in the Network's favor dismissing

41

eleven of the twelve counts in plaintiff's complaint.

We now proceed to examine the Network's discrete evidential arguments with these general observations in mind.

## 1. Redactions of the Deadspin Articles

The Network argues the court abused its discretion by granting Williams's application to redact the two Deadspin articles. We disagree.

During the Network's cross-examination of Petitti, who had been called by Williams as part of his case-in-chief, counsel for the Network moved to admit the first Deadspin article into evidence. Counsel for Williams objected based on hearsay. The court recognized that the article's assertions citing unnamed sources were "classic prejudicial inadmissible hearsay," but decided to give the jury a "very strong limiting instruction" explaining that the hearsay information is not reliable. After counsel for the Network moved the second Deadspin article into evidence, the court issued an instruction to the jury indicating that the hearsay statements in the document were unreliable and admitted for a limited purpose.

After both sides rested, counsel for Williams asked the court to reconsider and redact the articles. At that point, the court changed its earlier decision, concluding that some of the statements contained in the articles were unduly

prejudicial under N.J.R.E. 403. The court noted that, "[i]t's not the type of thing that anybody would want to have their reputations or their livelihoods based upon the allegations by unidentified double, triple, quadruple hearsay declarants." It found that providing the articles to the jury in their entirety would be far too prejudicial, because they contain "[wholesale] inadmissible hearsay about allegations from unnamed sources."

Counsel for the Network opposed this approach, arguing that Williams's proposed redactions eliminated the substance of the articles. The Network maintains the same argument on appeal, claiming the redacted versions of the articles were "virtually meaningless."

Pursuant to N.J.R.E. 403, relevant evidence may be excluded if its probative value is substantially outweighed by the risk of (a) undue prejudice, confusion of issues, or misleading the jury or (b) undue delay, waste of time, or needless presentation of cumulative evidence. "The trial court has broad discretion in making this determination." Toto v. Princeton Twp., 404 N.J. Super. 604, 620 (App. Div. 2009). A trial court's application of "N.J.R.E. 403 should not be overturned on appeal 'unless it can be shown that the trial court palpably abused its discretion, that is, that its finding was so wide [of] the mark that a manifest denial of justice resulted.'" Green v. New Jersey Mfrs. Ins. Co.,

160 N.J. 480, 492 (1999) (quoting State v. Carter, 91 N.J. 86, 106 (1982)).

The Network's suggestion that the redacted articles are "meaningless" is a severe overstatement. Even in the redacted articles, the following allegations are clearly presented: that Williams was ejected from the Saturday game for arguing with and insulting an umpire, cursing, and engaging in a "profanity-laced tirade;" that Williams called a child a "pussy" at the Sunday game; and, most serious of all, that Williams ordered a beanball of an opposing batter during the Sunday game. The inclusion of the most serious allegations in the redacted version of the article weighs in favor of the court's application of N.J.R.E. 403 to exclude other, less relevant allegations from unnamed sources. The redactions did not cause a manifest denial of justice. The redacted articles displayed – and the parties presented ample evidence concerning – the most serious allegations of misconduct by Williams at the Mother's Day tournament.

The Network maintains that the court's redactions shielded other allegations of "improper conduct," which prevented the jury from concluding that those actions were publicized. According to the Network, the redactions prevented the jury from learning that Williams's "tirade" following his ejection during the Saturday game was made public. However, the opening line of the first article, which was not redacted, references allegations of a "profanity-laced

tirade in which he called an umpire 'motherfucker'" as the basis for his ejection. That the article's author seemingly erred by describing the tirade in the opening line as taking place before, rather than after, the ejection, is not particularly important to the ultimate issues in the case. The notable allegation is the alleged profanity-laced tirade itself, which the redacted article presents. The Network was not unfairly prejudiced. The jury clearly had enough information from the redacted article to conclude that Williams's alleged "tirade and obnoxious conduct," as the Network puts it, were made public.

Other allegations redacted from the articles include that Williams "complained about numerous calls throughout" the Saturday game leading to "repeated arguments with umpires on the field"; that Williams refused to leave the field for ten minutes following the ejection on Saturday; and that Williams heckled the opposing coaches throughout the Sunday game, citing unnamed sources. The Network argues these allegations were relevant because Petitti "repeatedly testified that the Network terminated Plaintiff because of the totality of his conduct at the Mother's Day [t]ournament."

The trial court did not abuse its discretion excluding these statements under N.J.R.E. 403. With respect to the allegation that Williams complained about numerous calls throughout the game or heckled umpires, the first article's

unredacted headline indicates that Williams was ejected both for cursing and arguing ("Mitch Williams Ejected from Child's Baseball Game for Arguing, Cursing"). The unredacted portion of the second article notes that Williams was "aggressive and argumentative" at the Sunday game. Thus, the redacted articles contained ample information for the jurors to conclude that Williams's disputes with the umpires were publicized, without providing them with the article's inflammatory hearsay statements from unnamed sources.

With respect to the allegation of Williams causing a ten-minute delay, the jury viewed the video of the Saturday game, which showed that the delay was only about five-and-a-half minutes. Thus, the ten-minute claim in the article redacted by the court was clearly exaggerated, unduly prejudicial, and far less relevant than the video itself.

The Network further argues that it was prejudiced by the procedure employed by the trial court, because the court ordered the redactions after the Network had rested. However, the record does not reveal any attempt by the Network to reopen its case to address the redacted articles. Moreover, "[t]he order of proof and the reopening of a case on rebuttal rest within the sound judicial discretion of the trial court." Healy v. Billias, 17 N.J. Super. 119, 122 (App. Div. 1951); see also Magnet Res., Inc. v. Summit MRI Inc., 318 N.J.

Super. 275, 297 (App. Div. 1998) (whether to permit party to reopen case to present additional testimony was within discretion of trial court).  In sum, no such abuse of discretion occurred here.

2. Testimony Regarding the Source of the Deadspin Articles

Next, the Network challenges the following portion of the transcript of the video testimony of A.M., whose son played on the Titans:

> Q.     Okay.  So, [A.M], we were talking about how after the game you received communications from coaches of the Titans, which indicated to you that they were looking to bury Mitch Williams; is that correct?
>
> [redacted]
>
> Q.     Okay.  And that, I'm sorry, your answer was?
>
> A.     Yes, I did.  I received a, an e-mail from [the Titans coach] telling me this.
>
> [redacted]
>
> Q.     Okay.  Go ahead.
>
> A.     So then I found out that they had put an article out on Deadspin, you know, about Mitch Williams and all these accusations.  And I then proceeded to speak with [the Titans coach] and ask him to retract that.

At trial, counsel for the Network objected to admission of this testimony.  The court overruled the objection, finding the statements admissible under the "state of mind" exception to the general ban on hearsay evidence. On appeal, the

47

Network argues the court incorrectly applied the hearsay exception. We disagree.

Pursuant to N.J.R.E. 803(c)(3), statements of "then existing mental, emotional, or physical condition" are not excluded by the hearsay rule. "Under this exception, hearsay statements reflecting a declarant's intentions or future plans are admissible to show that the intended act was subsequently performed." Brown v. Tard, 552 F. Supp. 1341, 1352 (D.N.J. 1982) (citing State v. Thornton, 38 N.J. 380, 389 (1962)).

The Network argues that N.J.R.E. 803(c)(3) does not apply because the coach's state of mind was irrelevant. In support, it cites the Supreme Court's admonition that the "'state of mind' hearsay exception should be construed narrowly, focusing specifically on the declarant's state of mind and whether that state of mind is directly relevant to the issues at trial." State v. McLaughlin, 205 N.J. 185, 189 (2011). In McLaughlin, a criminal case, the Court held that admission of hearsay statements under the state of mind exception was in error because the defendant's state of mind was not directly relevant to the prosecution, and the statement imputed the intent to commit a crime to defendant. Ibid. The court held that, to be admissible, a state of mind statement "must satisfy not only the requirements of the hearsay exception, but it also must

provide a causal link between the identity of the hearsay declarant and the party or issues on trial." Id. at 205-06. Here, the statements in question are of the opposing coach's "intent" to bury Williams. Statements of intent are expressly delineated as a hearsay exception in N.J.R.E. 803(c)(3).

Regarding the Network's relevancy argument, the court reasonably found that the coach's state of mind was relevant because the central issue in the case was whether the Deadspin articles contained false allegations. The record supports the court's conclusion that the coach's intent to plant stories to "bury" Williams was highly relevant to that issue. Therefore, the court did not abuse its discretion when overruling the objection and permitting this testimony into evidence.

3. The Court's Decision to Mute Portions of the Saturday Game Video

The Network objected at trial to Williams's request to mute certain statements from spectators from the Saturday game video, arguing there the statements fall under the "present sense impression" exemption to hearsay, N.J.R.E. 803(c)(1). The court granted the redaction request, finding the statements to be inadmissible hearsay.

According to the Network, the court muted the following off-camera comments made by unidentified spectators: men yelling at the umpire to "get

rid" of someone, presumably Williams; several people cheering and clapping after the umpire ejected Williams; a man screaming "come on, we're talking ten year old baseball" after the ejection; and a man yelling "get off the field, let the kids finish" after the ejection.[12]

The court ruled these statements were not merely present sense impressions; they were statements of belief. The court also concluded that the statements would be excludable under N.J.R.E. 403 because the risk of prejudice substantially outweighed the probative value.

On appeal, the Network argues that even if the statements were hearsay, they were admissible as either present sense impressions or excited utterances. That may be so, but the statements were nonetheless properly excludable under N.J.R.E. 403.

The Network argues that it properly offered the spectator statements to show "the contemporaneous reactions the crowd had to [p]laintiff's conduct." However, the crowd's reaction to Williams's conduct was not highly relevant to any issue at trial. The Network claims that the comments "would have provided the jury an opportunity to experience the 'feel' of what had occurred that day,"

---

[12] Counsel represented to us at oral argument that the muted portions of the recording total about sixty-four seconds.

but admitting the statements for that purpose would have minimal, if any, probative value to the issues.

The Network argues that the statements are relevant because they prove that Williams engaged in conduct that brought him into disrepute. However, the morals clause's reference to "public disrepute" surely must have encompassed more than displeasing an umpire or a handful of presumably oppositional spectators at a youth sporting event.

In contrast, the risk of the crowd's reaction coloring the jury's interpretation of events depicted in the video could have unduly prejudiced Williams, particularly in light of the fact that the Network did not identify the declarants.

Spectator complaints at youth sporting events, particularly in response to incidents involving the children of those spectators, are often team-biased and not proportional responses. Additionally, the statements seem to have been in response to some conduct not depicted in the video, because the video did not record all of Williams's comments and interactions with the umpires.

As the trial court sensibly explained, "[t]he jury can look at what occurred, make up their own mind about as best they can with what they observe – with what they're observing without anybody being influenced by what the spectators

are thinking."

Finally, even if the court erred by failing to admit the statements of these spectators into evidence, we do not see how such a mistake constitutes reversible error. As noted, the spectator comments had minimal probative value regarding the key issue in the case, which was whether Williams actually engaged in conduct that brought him into non-trivial public disrepute. Exclusion of the spectator statements was not "clearly capable of producing an unjust result." R. 2:10-2.

4. The Court's Exclusion of Media Reports of Williams's Past Behavior

Next, the Network claims that the court erred by preventing Petitti from discussing his knowledge of a 2008 article describing Williams's ejection from his daughter's youth basketball game for yelling obscenities at a referee. Petitti was also aware of a 2014 article that described Williams acting inappropriately and yelling at referees at a high school basketball game.

The Network asserts that counsel for Williams attempted at trial to portray the Network as arbitrarily requiring him to agree to no longer attend his children's sporting events through the proposed contract amendment. According to the Network, Petitti's testimony regarding Williams's bad conduct at other sporting events would have established the Network's motivation for offering

the contract amendment with that condition, and for terminating Williams's contract after he did not accept the addendum.

The trial court rightly expressed concern with such testimony opening the door to "a trial within a trial" regarding Williams's conduct at past sporting events. In order to balance that scope concern with the Network's interest in submitting evidence about Petitti's state of mind when offering the conditions in the addendum, the court permitted Petitti to testify that he had relied upon two prior reports of "bad behavior" at youth sporting events. The court cautioned counsel for Williams that if she sought to cross-examine Petitti regarding his reasons for requesting the addendum, the door would be opened for additional evidence regarding those prior instances.

In accordance with the court's instruction, Petitti testified as follows:

> Q. And you remember that one of the terms in the addendum was a proposal that he agreed not to attend any amateur sporting events, and that was intended to include his children's sporting events; correct?
>
> A. Correct.
>
> Q. Why did you include that provision?
>
> A. You know, I thought that, given the behavior over the weekend, given, you know incidents that had happened before that I was aware of, I thought it was a way to protect him and the network.

. . . .

Q. Okay. And you said you were aware of prior incidents. And without going into detail of them, your understanding of that was bad behavior by Mr. Williams at youth sporting events?

A. Correct.

Q. Okay. And did you understand that that was reported to the public?

A. Yes, I did.

Q. Okay. And who is – do you know who Phil Mushnick is?

A. Yes.

Q. Okay. And who is he?

A. He's a columnist for the New York Post who covers sports media, basically, –

Q. Okay. Is the –

A. – business –

Q. – New York Post a widely read –

A. Yes.

Q. – publication?

Okay. During the time that Mr. Williams was on leave, did you become aware of a story in Mr. Mushnick's column in the New York Post about bad behavior by Mr. Williams at a youth sporting event

involving his daughter?

A. Yes, it was in Mushnick's column, yes.

As the Network notes, the instances of prior bad conduct discussed in those news articles were only relevant insofar as they informed Petitti's state of mind when requesting the addendum. As the above exchange demonstrates, the court fairly permitted Petitti to testify that part of the reason he requested the addendum was because of prior reports of Williams's bad behavior at youth sporting events. Petitti explained that those prior reports were public.

The record does not support the Network's claim that the court "prohibited [the Network] from rebutting" Williams's characterization of the addendum as an arbitrary act. The Network argues that the court should have admitted the past media reports into evidence, but it is unclear what those reports could have added to Petitti's testimony. Admitting those reports would have created numerous fact issues regarding events not directly relevant to the case, and could have confused the jury. The court did not abuse its discretion in how it balanced these concerns.

In addition, N.J.R.E. 404(b) supports the court's ruling. Rule 404(b) prescribes that evidence of other wrongs or acts is "not admissible to prove the disposition of a person in order to show that such person acted in conformity

therewith." Without a very strong limiting instruction, admission of the articles would have created the risk of a N.J.R.E. 404(b) violation. The court's decision wisely avoided the risk of unduly prejudicing Williams by admitting evidence of prior wrongs. The jury could have misinterpreted those prior acts as evidence of a character disposition to engage in similar acts at the Mother's Day tournament.

The court adequately balanced the need to avoid a "mini-trial" on Williams's past conduct with allowing the Network to demonstrate the reasons for Petitti requesting the addendum. Therefore, the court did not abuse its discretion on this issue and committed no reversible error.

5. The Court's Decision to Exclude Evidence of Williams's Prior Statements About Intentionally Hitting Batters

The Network further argues that the court should have allowed it to introduce evidence from his deposition testimony and from a post-retirement autobiography, in which he discussed his strategy of intimidating batters to obtain a psychological advantage while playing professional baseball. In his book, Williams provided a specific example, explaining that he struck the player Barry Bonds with a pitch on one occasion. Prior to trial, Williams moved to preclude the Network from utilizing this evidence. The court granted the application under N.J.R.E. 403.

On appeal, the Network claims the court should have admitted the evidence from Williams's book so the jury could decide whether the batter who was hit in the Sunday game "was an accident or part of [Williams's] strategy." However, as the trial court explained, inferring how Williams behaves when coaching youth sports from his comments regarding strategy when he was playing professional baseball is not appropriate. Admitting the statements would have run the risk of the jurors making that illogical inference, which supports the court's finding that the statements would be unduly prejudicial. As the record supports the court's application of N.J.R.E. 403, we are satisfied it did not abuse its discretion.

### 6. Exclusion of Alcohol-Related Testimony

The Network also argues that, in their video depositions, Bolewicki and Addis testified that Williams smelled of liquor during the Saturday game, slurred his words, and appeared to be intoxicated. According to the Network, the trial court improperly permitted Williams to redact these statements.

During a preliminary hearing before trial, counsel for Williams informed the court that she had recently received a list of the conduct that the Network claimed constituted morals clause violations, which included allegations regarding Williams's alleged alcohol use during the Mother's Day tournament.

Counsel pointed out that in previous interrogatory responses, the Network never stated it intended to rely upon that allegation as a reason for termination.

The trial court ruled, "[i]f that wasn't alleged in answers to interrogatories, it's not coming in an hour – a minute before opening statements." Counsel for the Network explained that the applicable testimony from the umpires arose after the Network had responded to interrogatories. The court responded that the Network should have amended its interrogatory responses if it wished to assert the alcohol use at trial. The court's ruling was not unfair, nor an abuse of discretion.

During trial, the alcohol issue came up again when the parties discussed redacting the video depositions. Counsel for the Network asserted that it did not seek to introduce the alleged use of alcohol as a reason for terminating the contract. Rather, it sought to introduce the evidence to rebut testimony from R.W. that, before the Saturday game, she observed one of the umpires tell a Ripken representative, "I'm not going to put up with Coach Mitch Williams." According to the Network, the testimony from the umpire regarding smelling alcohol on Williams's breath would explain why he made those comments to the Ripken representative.

After the parties read a portion of the Addis transcript that contained the

alcohol allegation, the court ruled, "[a]lcohol is out.  Everything but the alcohol could stay in."  The court cited its previous ruling.  In addition, the court alluded to automobile negligence in which evidence of driver intoxication generally is only admitted in limited circumstances.  See, e.g., Gustavson v. Gaynor, 206 N.J. Super. 540, 545 (App. Div. 1985) (an automobile negligence case, in which certain evidence of alcohol use was properly excluded because of its capacity to inflame jurors).

In addition, the trial court observed that "[t]he umpire, presumably, was concerned about Williams' behavior, not about – not – not concerned about what was causing that behavior."  It noted that, for the legal issues in this case, "it's behavior that counts."  It observed that prior to that point in the trial, alcohol had never been mentioned by any witness, and that Williams would be prejudiced if the issue were introduced so late in the case.

The record supports the trial court's conclusion that the risk of prejudice by admitting the alcohol evidence outweighed its probative value under N.J.R.E. 403.  The Network argues on appeal that evidence of alcohol use is probative of whether Williams engaged in the conduct, but, as we have noted, it did not proffer the evidence for that purpose at trial.  To the extent the allegations that Williams consumed alcohol prior to the game would have informed the jury

regarding whether he engaged in the subsequent alleged inappropriate conduct, it is only minimally probative, especially in light of the numerous eyewitness accounts of his conduct that day. See State v. Long, 173 N.J. 138, 164 (2002) ("[R]elevant evidence loses some of its probative value if there is other less inflammatory evidence available to prove that point.").

As the court reasonably observed, the core issue at trial was Williams's behavior during the Mother's Day tournament, not the underlying cause of the behavior. Had Williams consumed alcohol but remained silent at the games, he would not have breached the morals clause, because the articles do not mention any allegations of alcohol use.

### D. Comments By Plaintiff's Trial Counsel

Finally, the Network argues for reversal because of comments made by counsel for Williams during trial and four comments she made in her summation. We consider these arguments guided by well-established principles.

In general, counsel are afforded "'broad latitude' in summation." Diakamopoulos v. Monmouth Med. Ctr., 312 N.J. Super. 20, 32 (App. Div. 1998) (quoting Condella v. Cumberland Farms, Inc., 298 N.J. Super. 531, 534 (Law Div.1996)). "'[C]ounsel may draw conclusions even if the inferences that the jury is asked to make are improbable, perhaps illogical, erroneous or even

absurd.'" Bender v. Adelson, 187 N.J. 411, 431 (2006) (quoting Colucci v. Oppenheim, 326 N.J. Super. 166, 177 (App. Div. 1999)).

To be sure, "[s]ummation commentary . . . must be based in truth," and counsel "may not 'misstate the evidence nor distort the factual picture.'" Ibid. If summation commentary exceeds these limits, the court is to grant a new trial motion only if the comments are "so prejudicial that 'it clearly and convincingly appears that there was a miscarriage of justice under the law.'" Ibid. (quoting R. 4:49-1(a)).

A trial court "has broad discretion in the conduct of the trial, including the scope of counsel's summation." Litton Indus. Inc. v. IMO Indus. Inc., 200 N.J. 372, 392 (2009). Accordingly, the abuse of discretion standard of review applies on appeal to the trial court's rulings concerning such matters to the extent they were the subject of a timely objection. Id. at 392-93.

Moreover, to the extent the Network did not make a timely objection, it must not only demonstrate error but "plain error." The "[f]ailure to make a timely objection indicates that . . . counsel did not believe the remarks were prejudicial at the time they were made," and it "also deprives the court of the opportunity to take curative action." State v. Timmendequas, 161 N.J. 515, 576 (1999). "Where . . . counsel has not objected, we generally will not reverse

unless plain error is shown." Jackowitz v. Lang, 408 N.J. Super. 495, 505 (App. Div. 2009).

First, the Network argues that plaintiff's counsel improperly referred to hearsay "eyewitness statements" in the course of examining witnesses. The written statements had been gathered by Williams and his counsel from persons who had attended the Mother's Day tournament. At the Network's request, the trial court issued a pretrial order in limine disallowing plaintiff from admitting these hearsay statements, with plaintiff reserving the right to call any of those witnesses in his case-in-chief or on rebuttal. We are satisfied that the cited instances do not rise to circumstances "clearly capable of producing an unjust result." R. 2:10-2.

In several of the cited instances, defense counsel failed to timely object when a witness or the questioner referred to the instances in which there was a timely objection, and the court either reasonably overruled the objection or addressed the concern with an instruction to the jurors reminding them that counsel's comments are not evidence and that the jurors are the triers of the facts. At most, the jurors merely learned that other eyewitnesses statements had been gathered, but the statements themselves were not divulged. We discern no abuse of discretion in the judge's handling of these concerns when they were

called to his attention.

With respect to closing argument of plaintiff's counsel, the Network complains that she: (1) made an improper "adverse inference" argument against the defense by pointing to the absence of cell phone video recordings showing that Williams had used profanity; (2) suggested the Network had unfairly surprised plaintiff's counsel by calling K.N. to the stand; (3) suggested the Sunday game umpires did not hear Williams's alleged insult on the opposing pitcher; and (4) suggested the Network had conspired with others to prevent Williams from being reemployed as a sports analyst.

None of these contentions about the summation warrant relief on appeal. The "cell phone" reference was within the bounds of fair advocacy in pointing out the lack of such evidence. We discern no violation of the adverse-inference principles of State v. Clawans, 38 N.J. 162, 170-71 (1962) and, more recently, State v. Hill, 199 N.J. 545, 559-61 (2009). The jury saw the recordings of the tournament games and heard testimony from numerous people who had been present. Plaintiff's counsel fairly pointed out the non-existence of additional recorded evidence. Any error in allowing that point to be made was not clearly capable of producing an unjust result.

The Network made no objection at trial to counsel's reaction to the defense

calling K.N. as a witness. The trial judge was within his authority to reject this belated argument when it was raised for the first time after trial. Moreover, we presume the jury heeded the court's general instruction to focus on the evidence and not treat counsel's comments as evidence. See State v. Burns, 192 N.J. 312, 335 (2007).

Plaintiff's counsel's remarks about the Sunday umpires not hearing Williams insult a child was fair comment, and consistent with the testimony of Williams and Curll. Williams testified the umpire had approached him with the child's accusation, and took no action. Curll, the Ripken representative for the Sunday game, testified that the umpires and the Titians' coach had not heard Williams make the alleged insult. Although the Sunday umpires themselves did not testify, plaintiff's counsel made a fair circumstantial argument that they had not seen, heard, or corroborated the alleged insult.

Lastly, plaintiff's counsel's assertions at the end of his summation about Williams's inability to find employment after his discharge by the Network present no basis for reversal. Defense counsel did not object to the comments, and we are unpersuaded any plain error or undue prejudice occurred. Indeed, the verdict on Question Number Two rejecting plaintiff's claim concerning the option-year extension undermines the Network's argument that the jurors were

unfairly swayed by counsel's intimation of some sort of ongoing conspiracy by the defendant to harm plaintiff.

For all of these reasons, the Network's various arguments to set aside the jury verdict are unavailing.

## IV. Plaintiff's Cross-Appeal

In his cross-appeal, Williams challenges the court's February 5, 2015 grant of summary judgment to the Network on the eleven other counts of the complaint, apart from the breach of contract claim including the potential fee shifting claims under CEPA and LAD.

In assessing these arguments, we conduct de novo review and apply the general standards governing summary judgment as expressed in Rule 4:46-2. See W.J.A. v. D.A., 210 N.J. 229, 237-38 (2012). We must ascertain whether plaintiff's claims, viewing the record in a light most favorable to him, reflects genuine issues of material facts on the dismissed causes of action, and whether they are viable as a matter of law. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995).

### A. CEPA Claim

Count XI of the complaint asserted a claim under CEPA. Specifically, Williams alleged the Network terminated his employment as retaliation for his

decision not to sign the contract amendment, because he had a reasonable basis for believing that the restrictions contained in the amendment – particularly, the provision preventing him from attending his children's sport events – violated the law.

The general purpose of CEPA is to "protect and encourage employees to report illegal or unethical workplace activities and to discourage public and private sector employers from engaging in such conduct." Abbamont v. Piscataway Twp. Bd. of Educ., 138 N.J. 405, 431 (1994). Pursuant to the law,

> An employer shall not take any retaliatory action against an employee because the employee does any of the following:
>
> . . . .
>
> c. Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes:
>
> (1) is in violation of a law, or a rule or regulation promulgated pursuant to law . . . ;
>
> (2) is fraudulent or criminal . . . ; or
>
> (3) is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment.
>
> [N.J.S.A. 34:19-3c.]

A CEPA plaintiff relying upon this section must demonstrate that:

(1) he or she reasonably believed that his or her employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy; (2) he or she performed a "whistle-blowing" activity described in N.J.S.A. 34:19-3c; (3) an adverse employment action was taken against him or her; and (4) a causal connection exists between the whistle-blowing activity and the adverse employment action.

[Dzwonar v. McDevitt, 177 N.J. 451, 462 (2003) (citations omitted).]

"A plaintiff who brings a claim pursuant to N.J.S.A. 34:19-3c need not show that his or her employer or another employee actually violated the law or a clear mandate of public policy." Ibid. Rather, the plaintiff "simply must show that he or she "reasonably believes' that to be the case.'" Ibid. (quoting Estate of Roach v. TRW, Inc., 164 N.J. 598, 613 (2000)).

"[W]hen a defendant requests that the trial court determine as a matter of law that a plaintiff's belief was not objectively reasonable," the court must "make a threshold determination that there is a substantial nexus between the complained-of conduct and a law or public policy identified by the court or the plaintiff." Id. at 464. Courts must "identify a statute, regulation, rule, or public policy that closely relates to the complained-of conduct," and should "enter judgment for a defendant when no such law or policy is forthcoming." Id. at 463. "If the trial court so finds, the jury then must determine whether the

plaintiff actually held such a belief and, if so, whether that belief was objectively reasonable." Id. at 464.

Here, the trial court held that the CEPA claim failed because Williams did not "reasonably believe" that the amendment constituted a violation of law. It observed that the Network did not specifically demand that Williams cease attending his children's games; its proposed amendment would have prohibited him from attending all youth sporting events, which the court viewed as reasonable. Williams could not "reasonably have believed" that the conditions in the amendment violated "any type of public policy, law, statute, rule, [or] regulation."

On appeal, Williams argues that court erred by focusing on whether the conditions themselves were reasonable, rather than on whether he had a reasonable belief that the conditions violated the law, and that the court made improper findings of fact. However, courts affirm correct decisions even when the lower court's reasoning was incorrect. Serrano v. Serrano, 367 N.J. Super. 450, 461 (App. Div. 2004). As it is clear that the complained-of conduct bears no substantial nexus to any of the laws identified by Williams, the court should affirm dismissal of the CEPA claim, even though the trial court did not utilize that line of reasoning.

To support his threshold showing, Williams first claims he reasonably believed the amendment would violate the following provision of the New Jersey Constitution:

> All persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness.
>
> [N.J. Const. art. 1 § 1.]

The constitutional provision says nothing regarding employer-employee relations or for that matter, attendance at youth sporting events. If this provision were interpreted as broadly as Williams suggests, then every private employer's action that limits an employee's ability to engage in any conduct could be interpreted as implicating it. That interpretation would eviscerate the contours of the CEPA cause of action set forth in Dzwonar. The constitutional provision manifestly lacks a substantial nexus to the Network's complained-of conduct.

Williams further argues that he reasonably believed the proposed contract amendment violated the New Jersey common law, because "parents have a right to autonomy in deciding how to rear their children has deep roots in our history and culture." In re D.C., 203 N.J. 545, 568 (2010). However, the proposed amendment does not entrench upon Williams's right to raise his children. The

right has been described as protecting a parent's "primary role" as the caregiver for his or her children. Ibid.  The proposed amendment did not implicate or infringe upon Williams's primary role as the caregiver for his children.  It only would have required him to abstain from youth sporting events.  The common law doctrine concerning the right to parent bears no substantial nexus to the Network's complained-of request.[13]  Although the Network may have gone overboard in requesting Williams to stop attending his son's youth baseball games for a year, that request did not elevate this contractual dispute to a threat of constitutional deprivation.  The impetus of Williams's discharge was his behavior at the tournament, not his desire to coach or attend his son's games.

Williams also suggests that the proposed contract amendment would have infringed upon his "right to autonomous self-expression," which he argues stems from his right to privacy, due to the proposed social media restrictions. The contract amendment contained the following proposed condition:

> (iii) during the remainder of the Term, Artist shall not, unless approved in advance, and in writing, by Company, post to, or otherwise actively participate in,

---

[13] No case holds that a parent's right to attend a child's games is immutable.  We take judicial notice that at times Family Part judges have imposed conditions in restraining orders restricting a parent's attendance at sporting events.  In addition, youth sports organizations may authorize obstreperous parents or spectators to be excluded from attending games because of their behavior.  See N.J.S.A. 5:17-1.

any social media outlets (e.g., Twitter, Facebook, etc.)
for any purpose.

Williams provides no support for the novel proposition that the right to privacy protects against an employer's limiting or monitoring a public figure employee's social media output. Nor does he provide any precedent for the existence of an employee's right to self-expression when that right conflicts with the employer's legitimate interests.

The first Deadspin article contained images of a Twitter dispute between Williams and other Twitter users regarding the Ripken Tournament allegations, along with references to Williams as a Network analyst. Williams is undoubtedly a public figure. See Gertz v. Welch, 418 U.S. 323, 351-52 (1974). Thus, the Network had a legitimate reason to regulate Williams's social media output to protect its own interests. Williams cites nothing suggesting that the proposed contract amendment bears a substantial relationship to an employee's right to self-expression.

Finally, Williams argues he reasonably believed the amendment violated New Jersey's Social Media Privacy Law, N.J.S.A. 34:6B-6. Pursuant to that law, "[n]o employer shall require or request a current or prospective employee to provide or disclose any user name or password, or in any way provide the employer access to, a personal account through an electronic communications

device." N.J.S.A. 34:6B-6. Any agreement to waive those protections is void and unenforceable. N.J.S.A. 34:6B-7. This law went into effect December 1, 2013, and no case law has developed. Williams did not assert the Social Media Privacy Law before the trial court, either in his complaint, brief on appeal or at oral argument.

The Social Media Privacy Law bears no substantial nexus to the complained-of conduct. Williams does not allege that the Network attempted to obtain his passwords or otherwise access his social media accounts. Rather, it sought to monitor and regulate the content of his social media output, a measure which the Social Media Privacy Law does not preclude. The Network's desire to contractually limit his future social media output bears no substantial nexus to the Social Media Privacy Law's preventing employer access to social media accounts to protect employee privacy.

In conclusion, we affirm the trial court's dismissal of the CEPA claim because Williams failed to make the required threshold showing to pursue a cause of action under the statute.

## B. LAD Claim

Count V of the complaint alleged that the Network discriminated against Williams in violation of the LAD, N.J.S.A. 10:5-1 to -42. According to the

complaint, the Network perceived Williams as having a disability, and discriminated and retaliated against him by "ordering him to sign" the amendment requiring therapeutic counseling, suspending him, and terminating the November 2011 contract. In his cross-appeal, Williams argues the court made improper factual findings when granting summary judgment to the Network on this claim.

The LAD is "remedial legislation that was intended to be given a broad and liberal interpretation." Quinlan v. Curtiss-Wright Corp., 204 N.J. 239, 259 (2010). The law provides "a remedy for violation of civil rights that is independent of private or public contract." Ibid. The LAD declares it unlawful for employers to discriminate against any individual because of disability. N.J.S.A. 10:5-12(a). The LAD also declares it unlawful for any person to "take reprisals against any person because that person has opposed any practices or acts forbidden under this act." N.J.S.A. 10:5-12(d).

A prima facie case for discriminatory discharge under the LAD requires a plaintiff to prove:

> (1) he was disabled (or perceived to be disabled);
>
> (2) he was objectively qualified for his former position;
>
> (3) he was terminated; and

> (4) the employer sought someone to perform the same work after the plaintiff's discharge.
>
> [Hejda v. Bell Container Corp., 450 N.J. Super. 173, 193 (App. Div. 2017).]

Upon the employee establishing a prima facie case, "'the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employer's action.'" Ibid. (quoting Zive v. Stanley Roberts, Inc., 182 N.J. 436, 449 (2005)).

As to the first element in the prima facie LAD case, it is well settled that "those [persons who are] perceived as suffering from a particular handicap are as much within the protected class as those who are actually handicapped." Rogers v. Campbell Foundry Co., 185 N.J. Super. 109, 112 (App. Div. 1982). However, Williams does not identify the alleged perceived disability either in the complaint or in his briefs. He alleges that the following language from the amendment's proposed conditions is "evidence from which it may be reasonably inferred that [the Network] perceived [Williams] as disabled:"

> (iv) Artist has obtained, and will continue to attend, therapeutic counseling.

Although Williams fails to identify a perceived disability, it is evident from his reliance on this language that any such disability would be mental or psychological. Under the LAD, a mental or psychological conditions falls

within the definition of "disability" if it results from "anatomical, psychological, physiological, or neurological conditions which prevents the  typical exercise of any bodily or mental functions or is demonstrable, medically or psychologically, by accepted clinical or laboratory diagnostic techniques."  N.J.S.A. 10:5-5(q).

The trial court held that Williams had no disability, and that the Network did not perceive Williams as having a disability.  The court observed that sending an individual to therapy is a common response in such situations.  The court found the conditions set forth in the proposed contract amendment "perfectly reasonable" under the circumstances.  Williams argues that the court improperly made a factual finding that the Network did not perceive him as having a disability prior to any discovery on the issue.

The fact that Williams failed to identify, either in the complaint or in his briefs, a perceived disability within the meaning of the LAD, undermines his claim on this cause of action.  In addition, the provision for counseling does not automatically mean that the Network viewed Williams as suffering from an underlying psychological or mental disorder.  He fails to cite any support for the notion that a personality trait such as anger or short temper constitutes a disability within the meaning of the LAD.  Cf. Pouncy v. Vulcan Materials Co., 920 F. Supp. 1566, 1580 n.8 (N.D. Ala. 1996) (observing that, under the

Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101 to 12213, it is "clear that individuals with common personality traits such as poor judgment or a quick temper are not considered disabled.").

Indeed, although the LAD claim was not pursued at trial, Williams testified that his <u>own agent</u> was the one to initially propose such counseling, as a way to "show the world you are taking this seriously." It is equally as likely that the Network viewed the counseling as useful for its own public relations purposes.

In any event, Williams neither alleges nor provides any facts suggesting that the Network perceived that he suffered from an underlying disability. He cites no support for the notion that he was entitled to discovery to learn which, if any, disability the Network perceived. For these many reasons, the court's decision to dismiss the LAD claim is affirmed.

## C. Defamation-Related Claims

Williams's cross-appeal also challenges the summary judgment dismissal of three defamation causes of action: negligent defamation (count VIII); intentional defamation (count VI); and defamation per se (count VII). Williams further appeals the dismissal of his claim of invasion of privacy by portraying him in a false light (count X), and negligent misrepresentation (count III), which

he acknowledges stem from the same allegations that support the defamation causes of action.

These related causes of action are all premised upon the allegation that the Network provided false, misleading, and/or defamatory statements to the media. According to the complaint, the Network issued a statement to the <u>New York Daily News</u> without informing him, which read: "Mitch Williams has decided to take a leave of absence from his role at MLB Network at this time." Williams alleges that this statement was false, portrayed him in a false light, and caused him to suffer damages because he never decided to take a leave of absence. The complaint also alleges that the Network unilaterally issued a statement to <u>USA Today</u>, which stated that "the decision to take the leave was mutual." Williams claims the <u>USA Today</u> statement was also false, portrayed him in a negative light, and caused him to suffer damages.

The Network supported its motion for summary judgment on these claims with a certification signed by Fisher. According to that certification, she spoke with Williams's agent, Spielman, and obtained his approval, prior to sending the first statement to the <u>New York Daily News</u>. After sending the statement, Fisher sent Spielman a text message informing him that she sent the statement. She included the <u>Daily News</u> statement itself in the text message, and attached a

copy of the text message to her certification. Fisher certified that Spielman did not complain or object to the text message.

Fisher also certified that Sports Illustrated requested a follow-up to the first statement. Rather than indicate that Williams decided to take a leave of absence, as in the first statement, she informed Sports Illustrated that the leave of absence was the result of a mutual decision. Fisher then texted Spielman to inform him of her response to Sports Illustrated. Through text messages, copies of which are annexed to the certification, Spielman indicated that he preferred the first statement which had stated Williams decided to take a leave of absence. Thereafter, Fisher received another request for a statement from USA Today, to which she responded by explaining the decision to leave was mutual.

At oral argument in the trial court, counsel for Williams confirmed that Spielman remained his agent, but Williams did not submit any information from him to refute the Fisher certification. The court noted that it was a "problem" for Williams that he did not have his agent dispute the certification, and that he provided no reason for failing to do so. Thus, based on the undisputed facts set forth in the Fisher certification, the trial court found that "no reasonable jury could determine that the Agent [Spielman] did not agree to the language" in the statements. Accordingly, the court dismissed all of the defamation-related

causes of action under the summary judgment rules.

"A defamatory statement, generally, is one that subjects an individual to contempt or ridicule, one that harms a person's reputation by lowering the community's estimation of him or by deterring others from wanting to associate or deal with him." G.D. v. Kenny, 205 N.J. 275, 293 (2011) (citation omitted). The elements of a common law defamation claim are as follows:

> (1) the assertion of a false and defamatory statement concerning another;
>
> (2) the unprivileged publication of that statement to a third party; and
>
> (3) fault amounting at least to negligence by the publisher.
>
> [NuWave Inv. Corp. v. Hyman Beck & Co., 432 N.J. Super. 539, 552 (App. Div. 2013) (quoting Leang v. Jersey City Bd. of Educ., 198 N.J. 557, 585 (2009)).]

When, as here, the plaintiff is a public figure, he must demonstrate actual malice by clear and convincing evidence, rather than negligence. DeAngelis v. Hill, 180 N.J. 1, 13 (2004).

On appeal, Williams does not challenge the court's finding that he is a public figure, and the record supports that finding. Thus, the actual malice standard of liability applies.

The undisputed Fisher certification clearly demonstrates that the Network

A-5586-16T2

issued the statements with the consent of Williams's agent. Therefore, we agree with the court's conclusion that no reasonable juror could find actual malice under the circumstances, certainly not by clear and convincing evidence.

Williams's only argument on this issue is that the court's pre-discovery decision was premature. He disputes Fisher's certification and wishes to proceed through post-verdict discovery to challenge it. We decline that request.

A "motion for summary judgment is not premature merely because discovery has not been completed, unless plaintiff is able to 'demonstrate with some degree of particularity the likelihood that further discovery will supply the missing elements of the cause of action.'" Badiali v. N.J. Mfrs. Ins. Grp., 220 N.J. 544, 555 (2015) (quoting Wellington v. Estate of Wellington, 359 N.J. Super. 484, 496 (App. Div. 2003)). Further, "summary judgment is particularly appropriate for disposing of non-meritorious defamation suits." Rocci v. Ecole Secondaire Macdonald-Cartier, 165 N.J. 149, 158 (2000); see also Sedore v. Recorder Publ'g Co., 315 N.J. Super. 137, 163 (App. Div. 1998) (noting that Supreme Court has "urged courts trial courts not to hesitate to employ summary judgment to expedite such litigation whenever appropriate.").

As noted by the court, Williams did not obtain any certification from Spielman, the only individual who could dispute the Fisher certification, despite

the fact that he remained his agent. Nor did Williams ask for more time to obtain such a certification, indicate in any way that Spielman would provide an alternative version of the facts in the Fisher certification, or question the authenticity of the text messages. Under these circumstances, the court did not err by granting summary judgment on the negligent defamation, intentional defamation, and defamation per se claims.[14]

Williams acknowledges that he premised the false light and negligent misrepresentation claims upon the same conduct challenged in the intentional defamation cause of action. It is well settled that it would be "intolerably anomalous and illogical for conduct that is held not to constitute actionable defamation nevertheless to be relied on to sustain a different cause of action based solely on the consequences of that alleged defamation." LoBiondo v. Schwartz, 323 N.J. Super. 391, 417 (App. Div. 1999). Thus, when there is no actionable defamation, "there can be no claim for damages flowing from the alleged defamation but attributed to a different intentional tort whose gravamen

---

[14] "Defamation per se" refers to "a statement whose defamatory meaning is so clear on its face that the court is not required to submit the issue to the jury." McLaughlin v. Rosanio, Bailets & Talamo, Inc., 331 N.J. Super. 303, 319 (App. Div. 2000) (quoting Biondi v. Nassimos, 300 N.J. Super. 149, 153 n.2 (App. Div. 1997)). Thus, it only relates to one of the elements of defamation – whether the statement at issue has a defamatory meaning – and was properly dismissed for the same reasons as the other defamation claims.

is the same as that of the defamation claim." Ibid. The court properly dismissed the false light and negligent misrepresentation claims together with the defamation claims.

For these multiple reasons, we affirm the trial court's dismissal of Williams's claims of negligent defamation, intentional defamation, defamation per se, false light, and negligent misrepresentation.

## D. Other Dismissed Claims

Finally, Williams's cross-appeal challenges the trial court's dismissal of counts II (breach of implied covenant of good faith and fair dealing), IX (intentional interference with prospective economic advantage), and XII (prima facie tort). We are satisfied the court's dismissal of these three claims was the correct result.

### 1. Implied Covenant

Every contract contains an implied covenant that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Ass'n Grp. Life, Inc. v. Catholic War Veterans of U.S., 61 N.J. 150, 153 (1972); see also McGarry v. Saint Anthony of Padua Roman Catholic Church, 307 N.J. Super. 525, 533 (App. Div. 1998) (same). The implied covenant cause of action applies in three scenarios:

(1) it "permits the inclusion of terms and conditions which have not been expressly set forth in the written contract;" (2) it allows "redress for the bad faith performance of an agreement even when the defendant has not breached any express term;" and (3) it permits "inquiry into a party's exercise of discretion expressly granted by a contract's terms."  Seidenberg v. Summit Bank, 348 N.J. Super. 243, 257 (App. Div. 2002).

None of those scenarios is involved here.  The Supreme Court has held that the cause of action does not provide a plaintiff with additional damages for the breach of an express term of a contract.  Wade v. Kessler Inst., 172 N.J. 327, 344-45 (2002) (where the "two asserted breaches basically rest on the same conduct," there "can be no separate breach of an implied covenant of good faith and fair dealing").  Here, Williams premises his implied covenant claim on the same conduct (i.e., wrongful termination) alleged in the breach of contract claim, for which he has received a favorable jury verdict.  Accordingly, we affirm the dismissal of the implied covenant claim.

## 2.  Intentional Interference

An intentional interference claim requires proof of the following elements: (1) a reasonable expectation of economic advantage with third parties; (2) intentional interference with those prospects, without justification or excuse;

(3) the loss of prospective gain; and (4) damages. <u>Printing Mart-Morristown v. Sharp Elecs. Corp.</u>, 116 N.J. 739, 751 (1989). Williams premises his intentional interference claim upon two allegations: first, the Network issued false and defamatory statements; and second, that the Network suspended him from appearing on-air. He alleges that he expected to be called upon to broadcast games and/or provide written material for several television, internet, and radio programs, but the Network interfered with those prospects.

To the extent the claim is premised upon defamation, summary judgment was appropriate for the same reasons the false light and negligent misrepresentation claims were properly dismissed. <u>See</u> Part IV(C), <u>supra</u>. To the extent the claim is premised upon his suspension from the Network, Williams fails to state a claim. Nothing in the complaint suggests that the Network's intention when suspending him was to interfere with Williams's relationships with third parties. Nor does anything in the record support that notion.

Williams alleges that the Network "directly controlled" whether he would be chosen as an analyst for one broadcast network. If that were the case, the Network would have no need to suspend him from its own network to interfere with his prospects at another network.

The gravamen of the interference claim is the allegation of false statements, which we already have concluded are not actionable on this record. Therefore, the court properly dismissed this claim.

### 3. Prima Facie Tort

Pursuant to the prima facie tort doctrine, "'[o]ne who intentionally causes injury to another is subject to liability to the other for that injury, if his conduct is generally culpable and not justifiable under the circumstances,'" even if "'the actor's conduct does not come within a traditional category of tort liability.'" Taylor v. Metzger, 152 N.J. 490, 522 (1998) (quoting Restatement (Second) of Torts § 870 (1979)).  However, the doctrine "should not be invoked when the essential elements of an established and relevant cause of action are missing." Id. at 523.

"Prima facie tort should not become a 'catch-all' alternative for every cause of action which cannot stand on its legs."  Ibid. (citation and internal quotation marks omitted).  "Assuming, without deciding, that our common law may admit of a cause of action for prima facie tort, it is solely a gap-filler." Richard A. Pulaski Constr. Co. v. Air Frame Hangars, Inc., 195 N.J. 457, 460 (2008).

As Williams succeeded before the jury on his breach of contract claim,

A-5586-16T2

there is no need for the prima facie tort doctrine to serve as a common law gap-filler or back-up theory. We affirm the dismissal of this claim as well.

## V. Conclusion

For the reasons we have detailed, the outcome of this hard-fought lawsuit will not be disturbed. The trial court fairly dealt with the abundant legal and evidentiary issues presented by both sides – before, during, and after the trial. The proofs at trial provided ample substantial evidence to support the jury's verdict, and the jury's credibility-laden assessments deserve our deference.

Although both sides are disappointed with aspects of the final judgment, we discern no injustice whatsoever in leaving it intact.

Any arguments we have not addressed in this lengthy opinion lack sufficient merit to warrant discussion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5586-16T2